Sword v. Paytime and Hope v. Paytime. May you proceed? Good morning, your honors. My name is Gary Lynch, and I represent the appellants in this case. I'd like to reserve five minutes for rebuttal, okay? And I'd like to thank you for giving me an opportunity to talk about Article 3 standing today. Somehow, I don't know about my colleagues, but I did look at that as a big virtuity. Well, I'm not going to say I was being facetious. You were burdened, maybe. A couple of basic points that I want to make. Obviously, we're relying on a briefs, but I want to hammer home, if I can, a couple of key points. The first main point is that we have plausible allegations in our consolidated amended complaint in this case that establishes standing. What do you believe you have to allege under the case law? Well, we know that you have to have an injury in fact. No, no, no. Say it to the case law and tell me what Clapper and Riley, what those cases say you have to have alleged. So, the answer to the question I want to throw down, if we're talking about just establishing a future risk of harm or risk of future harm as a basis for establishing the injury in fact, How about substantial and imminent? Right, that's when you get into the imminence requirement from Clapper. What have you alleged to satisfy an imminence requirement? Well, we have alleged that similar to the decisions in the 7th Circuit Assuming that misuse is not, Riley's read to not require misuse, but imminence, how have you satisfied that? That's right. So, you know, I see it as a continuum of imminence that's been developed in data breach cases. Yeah, but the question is what have you alleged? Yeah, I want to place this on the continuum. But what we've alleged is that there's been an actual theft of the data by somebody who's in a position to use it and to sell it on the black web. But how is it imminent that they are going to use it? Well, that's where the plausibility and the inferences come into play on the continuum. And other cases have said that. You don't have to show that it is absolutely happening or going to happen. You have to show that it's certainly impending. Is it not speculative that there will be use, especially at this point? Is it not speculative? Yeah, whether you say the standard is certainly impending or substantial risk of future harm, there's some speculation in all of that. It's a continuum. There's a continuum. And somewhere on that continuum, you cross the line and say, okay, now we actually have an injury. Help us figure out where that lie is. I assume this comes from the district court opinion. Someone here read that the chances, statistically speaking, of a theft, a purposeful theft. I think the cases talk about malicious. A malicious theft by someone who apparently is a rather sophisticated professional hacker, if you will, is 25%. And the district court talks about how that's the name of the district court opinion. The district court talks about 25% is not substantial. Maybe you can respond to that. Why is the district court wrong? It means there's a 75% chance that nothing will be used or at least no one specific plaintiff is going to be hurt. Right. I don't think Article III of the Constitution requires some sort of statistical probability analysis. If that's the correct probability analysis, the better comparison would be what are the increased odds of being subjected to that type of harm compared to somebody who has not experienced the damage. Isn't that a probability analysis? Excuse me? Are you talking about increased odds? Isn't that a probability analysis? Yes. But I think that you don't need to do that quantifiably that way. I think it's more of a subjective analysis on, like I said, on a continuum of events. And the three primary events, if I may, Your Honors, is you have on one side a simple exposure to data. That's what you had in the Riley case. The firewall was breached. And there's no indication it was by anybody that was in a position to even know what it is they were getting or that they got it. Then you evolve to more of the middle ground here. And that's one that has developed a lot of the case law where the standing has been established, the Seventh Circuit, the Ninth Circuit. Well, Seventh Circuit, there was 9,200 cards had been fraudulently used. So you had something. What do you have here at that middle stage? What do you have? So what we have here in the middle stage is where you have the actual misappropriation or theft by somebody in a position to actually misuse information. Well, that happened at the beginning. That's the same thing as access. No, it's different than access. Really? If I look and see it, I have accessed it and I have stolen it, have I not? No, because you could have infiltration and exfiltration in data breaches. Well, then tell me as a factual matter what you do have. Is it more than that they saw it and therefore took it? Somebody that saw it, that knows what it is, that's in a position and was seeing it for the purposes of stealing it. How do you know that? As opposed to somebody that just infiltrated a system. How do you know that they were for the purpose of using it or for the purpose of stealing it? You can draw that inference primarily by our allegations and our complaint from the very announcement of the defendant in this case. Did you specifically allege that? We've alleged that as well. We've alleged that as well. But as far as the plausibility of it, that stems from the underlying facts that we have, which are primarily the letter that they sent announcing the data breach saying it was foreign hackers that were malicious in intent in trying to steal the data. That's different than somebody picking up a laptop because they want the laptop, not knowing that there's encrypted or unencrypted data on it. But isn't the difference kind of in the head, kind of the eye of the beholder, the head of the person? I mean, I can hack something and I don't know what I'm doing, but I just push a button and all of a sudden I have access to information. Yes. How is that different from I'm a malicious foreign person and I access it intending to use it, but I don't act on it? Because the latter makes it much more imminent. The threat is much more imminent. Imminent, probable, or imminent? Imminent. Imminent. See, I don't understand. Help me understand the difference. Why is an imminent an expression of probability? It's the likelihood of something occurring in the relative, they assume, future. It is an expression of probability. My only suggestion was it's not something that you quantifiably analyze. But it's also temporal. And the imminence here is the fact that it's been three years. Well, it's temporal. Isn't it imminence? It's temporal, but you have to put it in the context of what's going on. And I don't think any of us have that level of sophistication to know how the dark web works. Oftentimes, and I can tell you this, it's not in the complaint, but oftentimes the data thieves aren't the ones that misuse the information. They sell it on the dark web. Isn't it on the record? If it's not on the record, isn't that on the record? That might be in the complaint. We may have it in the complaint that it's a secondary source. And I'm just adding a little color here just for the sake of the question. We never had discovery. And to say that it's been three years, we've been frozen for a year and a half. I mean, unlike the data breach cases that involve credit cards, I'm involved in those too, Your Honor. In fact, I represent the banks in those cards and have to reissue the cards. Unlike those cases where you have data from the card grants about fraudulent use of the cards, you don't have a repository of data showing that there's been identity theft. But don't you think if there had been something, you certainly would have heard about it? I don't know that. I'd say it is if we take the discovery. Would they tell you that their identities were stolen? Or if you named plaintiffs, maybe not told us anything about the data being stolen. But even if they did, it wouldn't be in the record here and it wouldn't be for the court's consideration. The point was we have alleged plausible facts to substantiate standing by showing that the theft by somebody in a position to misuse it creates the imminent threat of future harm that Clapper talks about. Did you seek discovery in the district court for purposes of showing imminence? No. It was a facial attack on the allegations of the complaint, and we stood on the complaint ultimately. And you did not plead an invasion of privacy? We did not plead it as a tort, although I don't think that it's necessary to plead it as a tort to show that it's harm here. And that harkens to the recent decision on this court. So the harm is not a cause of action, but you're saying that? It's a harm for constitutional standing purposes. That's right. It's certainly something that you could point to in a negligence claim and say, hey, you've been negligent in how you've handled my data, and as a result, my privacy's been invaded. It's a legitimate harm for constitutional analysis as it relates to standing. If it's a separate tort, that's fine too. We have not alleged that. Why is it the wrong party here, the party in the wrong, the employer? Well, I think there's something strange about this case. You don't have any privity. You bring a breach of contract case, but you're not in privity with pay time. Right. So why not just sue the employer? Yeah, we think that our primary claim is the negligence claim, in which case you'd be talking about extending a duty to that level. So why leave a duty to you? The pay time's customer is the employer, right? Well, they would have a duty to us. The employer has not sued, or have they? They have not, and they would have a duty to us because it's basic foreseeability analysis. It's our data that they are gathering and putting into a computer-based repository to monitor and to manipulate for purposes of doing their function. So it's clearly that it's foreseeable that our plaintiffs, the class of employees, are the people that are going to be harmed when that data gets out. I guess your argument is that that's all beside the point because that might mean, you're not going to concede this obviously, but it might mean that you have a weak case, but it doesn't shed any light on whether you have stint. That's right, Your Honor. I think it has nothing to do with the 12B1 analysis, but I don't think we have a weak case because then we'll get into discovery and show the shortcomings in their computer system and how they failed to keep it protected adequately. Maybe you can use it in a 30-day letter, but I'm still looking for the specific allegations in the complaint that Judge Wendell began with. If you could submit that to us. Don't take the time now, but you can do it in a 30-day letter. Afterward, your friends on the other side of the aisle will obviously see a copy of that because that obviously controls our analysis and it has a weak deal. The two primary ones with my ten seconds left would be the reference to their letter announcing that it was foreign hackers that were sophisticated in nature that stole the data, and then their concession in their very brief at page 9, their first response brief in page 9, that in fact our allegations that the data was stolen was well pleaded. They conceded that issue. Those two facts, those are in the complaint and ones in the brief as a concession, make this case different than the Riley case. You plead that the hackers continue to use the information, but you didn't allege that they actually have used the information, have you? What do you mean by use the information, Your Honor? These hackers will most likely be selling the information. Okay. Well, use it or sell it. Yeah. But you don't plead that they have actually done it. We don't plead that we're down to the farthest end of the continuum, which is actual misuse. We don't have to establish actual misuse. That's based on Clapper. That's based on Spokio. That's based on the 7th, 6th, 9th circuits, and I think the 4th. Let me just ask, how does Spokio help you or hurt you? Spokio just reiterates that Clapper was, depending on which phrase you want to use, whether it's a substantial risk, whether it's certainly impending, Spokio just used the phrase real risk of harm. It's just a continuum where you know when you cross a barrier, you've got enough of a threat for future harm in order to confer standing. But that's not the only basis. Wait, what are you getting out of Spokio? What's that? Is that all you're getting out of Spokio? That's all I'm getting out of Spokio for this case. I'm not using this case for statute. We are not alleging a statutory damage analysis. But there's more to Spokio than a statutory discussion. In fact, they go so far as to say that Congress can't, by statute, create standing that would not otherwise be an article of communication controversy. But the fact that Congress has created this cause of action, they're saying, you know, it's prostituted. This is in the inquiry into Article III harm. The other thing to get out of Spokio is our request that this court adopt the concurrence in its horizon decision, which is that if there is a longstanding tradition in the common law in jurisprudence generally, that this type of harm is protected. Well, that's the invasion of privacy. The invasion of privacy, but it's not a court. But as you said, that's the harm. That's not the cause of action. That's right, but that's the harm here. It's an element of harm. It's an element of harm here that could establish Article III standings. And that's the other thing we get out of Spokio, but we get it through the horizon decision of this court. Are you saying you couldn't have brought an invasion of privacy tort? I suppose we could have brought an invasion of privacy tort. We have not. Well, that's an intentional tort. You could have brought a breach of confidence tort as well, right? There are other common law torts. But as I understand it, that was not raised at any time, was it, breach of confidence? We never raised it in the complaint. It was not alleged. It was not alleged. But we think that we have harm under a negligence theory. So at this point, you're saying that the harm is the same no matter what legal authority you stick it into. The harm that you're alleging, you're saying, is sufficient for Article III purposes. Yeah, Article III. We're just looking for harm here. Let me just ask one more question about the harm. If these data miners are in the business of stealing people's information and selling it on the dark web, as I understand it, that's the harm right there once they've sold it. That's your position. We think there's harm the second that our privacy has been invaded, the planet's privacy. We also think there's harm. Because you're asking if it's the sale on the dark web. Your response suggests it's the actual intrusion and appropriation of the data, not the second step. I'll make two arguments at the same time, right, that we have actual current harm. I think we need to parse that because I know this is a counterfactual, but stick with me for a minute on this. What if the intrusion is done by, and the data mining is done by a company, a security company, hired by Paytime to test its firewall? Under your theory, that's actionable, even though it was a friendly attack. You mean under my theory of harm or my theory of a cause of action? Your theory that you would have standing in that instance because somebody... If I had a claim. I don't know what claim it would be. As I understand, you claim you would have standing because someone accessed all of the employee's data. And my challenge to you is, well, wait a minute. I wouldn't call that harm because when Paytime or any other company hires a security company to do one of these friendly attacks, which happens regularly, by definition there's no harm because everyone knows it's a friendly attack. But yet, there has been an intrusion and there has been a gathering of all that data. So it has to do with where the right comes from. Does it come from a statute or does it come from a common law? You accept that proposition. I accept the proposition that there are things that can happen, that if there's no right being infringed upon, then there's no harm from it. But you're saying you have a common law history of not intruding on somebody's privacy against their right. Right, but you brought a negligence action. To Judge Rendell's point, I mean, there are common law torts that could have been alleged, but they're not an issue in this case because you just brought a negligence tort. That would be great if somebody makes a 12b-6 argument someday about another claim, but this is 12b-1, this is Article 3 of the Constitution, I'm showing harm. The harm of intrusion of my privacy gets me past Article 3 standard requirements. Take that a step further because in the proposition you just offered by Ms. Hardeman, there is an intrusion on your privacy, but I'm not sure how you would raise that level of harm. In fact, you could argue the contrary, that that intrusion leads to enhanced protection of the system, and therefore it's a benefit, it's not a harm at all. That's why I'm missing it. I thought you were focusing on the fact that the intrusion was malicious, not the very fact of intrusion, because that's a very, very big difference. But it's both. You have to put it in the factual context of the allegations of the complaint. The question is, why should I answer my question? There's no standard because there's not malicious. Well, in your example, I was focused on the fact that we wouldn't even have a cause of action. It helps us if we focus on our questions. There's no cause of action. Well, I'm not concerned about that because I'm trying to get to the bottom of your standing argument. I'm trying to figure out, I guess my supposition is that in my hypothetical, you would not have standing because there's no injury in fact. It would be assistance, in fact, rather than injury, in fact. That's right. Because the friendly attack, as Judge McKee just said, is to improve your security posture. You are at the risk of sounding crass. It's the difference between rape and sexual sex. Right? It's the same conduct. All right. Why is it the intrusion? So then it comes down. But it's not about the intrusion, and that was the purpose of my question. It's about the maliciousness. It's about the intent of the actor who gathers the data. That, in part, and the other factual context in which the allegations have occurred. All right. And you've alleged that the intent was clearly malicious because Paytime's own letter so conceded. Exactly. And that's plausibility. Now, it's a pleading stage, and we're going to conduct discovery and find out more. There's always an forensic investigation that occurs. Okay. Well, and how – and I know you've had this for a while. But one thing, I read it again this morning. I missed it the first time. And the thing that kind of mystifies me is Spokio. The information that was erroneous in his profile, I don't know how that harmed him. The profile, and I'm reading from the opinion. His profile, he asserts, Spokio's, states that he is married, has children, is in his 50s, has a job, is relatively affluent, holds a graduate degree. According to Robin's complaint, all this information is incorrect. But it seems to me that all that information is pretty positive stuff. Yeah, I didn't know what the alternative facts were, Your Honor, when I read that myself. But the point in Spokio was you can't dismiss it just because you think it's an argument. Congress says it's not. And you have to at least stop and look at that. I'm not saying you have to take Congress's words. Congress can say it's not. They can say it's not. But we don't have that case. Right. We don't have that case. Right. That's not what this is. This is not a statutory state case. The interesting thing is while you say that invasion of privacy is the harm, none of the case law has permitted that to constitute or be sufficient for standing. They actually talk about the substantial risk of misuse. Until horizon. Well, but that's a statutory case. Well, that's a concurrence. The concurrence was not about a statutory claim. In fact, he set that aside. No, no, no, you're right. The judge set that aside and said, no. Setting aside the statutory standing, that's a bad phrase, but setting that issue aside, you have harm here that would confer standing simply from the invasion of privacy. That is perhaps the first time that any appellate court and the federal courts have used that approach. Making the argument that far, though, it seems to me that that raises a problem that Judge Hardiman's hypothetical makes a good point of view. Just arguing the invasion of privacy per se and decoupling it from the harm, then you're saying that there's an automatic harm whenever there's an invasion of privacy. But unless you're making something out of an agency argument, which I guess you could make, that there's been no invasion because the person bringing the security check to have invasion is an agent of the principal and, therefore, there's really no. But you're not. You weren't making that argument. I just gave it to you. But it is contextual. That's the argument I've been trying to make. Maybe I haven't been doing it inartfully, but it's contextual. And the allegations of the complaint, based upon the defendant's own representations for our class, is that this was malicious. I may want you to address that. Because, I mean, invasion of privacy is a separate intentional tort, we learned in law school. It is an intentional tort. As to whether it is an action of, it constitutes harm that can support standing, separate and apart from that. I mean, if someone comes and looks in, they happen to be going by my house, and they, you know, look in the window and They still want you to protect them. Yeah, that's right. Negligently, you know, that constitutes harm that gets you past standing. I don't know about that. We may want you to address that. That's fine. Don't forget, we're not giving up the ghost on the idea of imminent harm, too. Right? It isn't just about this harm of invasion of privacy. If you're going to submit a letter that gives us all of the allegations that you believe support the substantial harm, would you include in that how, somehow, your invasion of privacy harm gets you past standing? Yes. Is that all right? Yeah. Include evidence in that. Yeah. Thank you. Thank you, Your Honor. You used up your rebuttal. I think we expand the argument with all the time we have. I'll just sit down, I guess. No, no, no. Good morning, Your Honors. I'm Claudia McCarran, and I represent Paytime, Inc. Would you pull the microphone down just a little bit? Thank you. Well, maybe Spokio's focus is too strong a word. But they clearly said that, and they focused on concreteness, which has kind of all of a sudden been thrust into other procedures, not for standing purposes. But they said that an intangible injury can nevertheless be concrete, and then they focused on that element. If that is true, and forget imminence for a second because that's a different kind of issue, or maybe it's not, but let's assume it is. If that's true, then why wouldn't the injury here, which is clearly intangible, nevertheless have the potential to be sufficiently concrete, and forget the statutory issue for a second, be sufficiently concrete to get you Article III standing? It's clearly intangible. But why isn't it nevertheless possibly concrete? As I understand, Spokio, it is difficult to divorce it from the statutory context, but it tells us that concreteness is part of the standard, and it can be satisfied by an intangible. But it still must be an intangible harm that is either actual, it's happened, and in the case of a statutory violation, it's concrete. How can it be concrete if it hasn't happened? Now we're getting into metaphysics. And I think this is we always talk about injury in fact as having maybe three elements, one is particularity, concreteness, and then that it's actual or imminent. But I think actual or imminent also informs concreteness. And the court judge officer's opinion in Riley makes the link where he says that. In Riley, they didn't even know if they had their breach, period. That's all they knew. There hadn't been a breach. In fact, it may even be worse than that. There may just have been a potential for a breach because there was this problem there that allowed the hacker in. They didn't know if the data had been accessed. They didn't know if it had been read. They clearly did not know whether it had been misappropriated for any kind of commercial purpose. Here the allegations are exactly that, that the information has been accessed and that the intrusion was for the specific intent of misappropriating it for subsequent commercial sale. Why isn't that very different from Riley? Because right at the very beginning, AutoCert seems to limit the context in which the Riley analysis proceeds. That's my concern. There's no question that Riley has a sentence that says, we don't know if the hackers read, copied, understood. But it also quotes the notice letter that went out in Riley, which acknowledges access. The notice letter in Riley reads very much like the notice letter that paid funding. It's just access. That doesn't get you away from Judge Harden's analogy. This is someone's friendly access. Well, I've looked at the briefing in Riley, and the complaint in Riley is part of that record. And the complaint alleges that it was stolen. I mean, that was part of the record. It was stolen. But there really is no such thing. The only assumption is not knowing whether the hacker read it, copied it, or understood it. So it was just a pure, almost an abstract taking of some bits, some ones and zeros in a computer file, without any allegation that the purpose of that taking was to do harm to the person whose information was taken. There was no allegation that the taking created a harm, because they didn't know what the purpose of that taking was. Now here, there's an allegation as to the specific reason the stuff was stolen. I don't think that the allegation here that it was an intentional taking to sell it is supported by anything unique to Paytime that couldn't also have been speculated about in Riley. But it is sheer speculation. What we know in Paytime. Well, how can they know exactly what happens with it until they get discovery? I mean, are you saying there has to be misuse, actual misuse for there to be standing? Or some condition that misuse is imminent. All right, well, if somebody took your car keys while you're up at the podium, is that imminent harm? If they steal your car, you say no. You don't call the car dealership and get your keys changed? When they steal your keys, you are going to go home, and you're going to get your second set of keys, and you're just going to drive your car around blissfully with your second set of keys. You're not going to get the locks changed on your car. Your Honor, I unfortunately have been in that position, and I did do just that, because if it was stolen. You did do what? I just got my second set of keys. And you didn't get your keys? No, because it's actually very expensive to have your car with electronic locks. Do you know if your keys were stolen, or you just mislaid them? I wasn't sure which it was. I might have mislaid them. But if you had known that they were stolen, if someone said, well, you know, somebody came in here while you weren't looking, and they had a. . . It was a well-known chop shop that was funded by people overseas. Not only have they stolen your car, but your keys, but they've stolen the keys of millions of other Americans. Here's the distinction, though. I don't know whether the person who has my keys just has a set of keys and was hoping to go out in the parking lot and walk around and hit the button until they found my car, and that's how they were going to make the connection. I don't know if they know who I am. Well, let's assume that's the case. The keys don't give them access to my car unless they know where my car is. They have to know more about me. You can button the key fob, and the car tells you where it is. That's the wonder of modern technology. Push a button, and the car goes, I'm over here. But they have to know. . . I mean, this does pertain a bit to what happens when data is stolen. They have to know where my car is to go run that test. They don't have to know. They have to have a. . . I don't know what the radius of the signal that was out is. They have to have a general idea, where they can check every parking lot near the courthouse and push the button until they hear a car beeping, and they find your car pretty easily. They certainly could do that. But we don't know whether or not they have the incentive to do it, the time to do it. You're saying that wouldn't be imminent. That would not be imminent. Then why not? Because if it's imminent, going back to the data standards, they have my keys, so they access my information. They have the incentive to steal my car. Maybe they just took my keys for a prank. And they have the wherewithal to steal my car. But you don't see them in the parking lot close to your car. Right. They're nowhere near it. They don't even know what parking lot I'm in. There is no allegation here. I mean, we'll get clarification. But as I see it, there's no allegation of any intent on the part of these hackers to do something, whether to use or to sell. I don't see that. It is that they stole it. But I don't see any allegation. And I guess that's a softball. Unfortunately, there is a bald allegation that they intend to use it. But there is nothing that would inform us in that complaint that that's anything more than just a supposition of the plaintiff's counsel in drafting that. But your whole letter said it was a malicious hack. No, we didn't use the word malicious, Your Honor. What was the language? It was a hack instituted by skilled hackers from foreign IP addresses. Right. Okay, so skilled hackers. Right. Skilled hackers means they know how to get in. They got in. Identified and exploited a vulnerability. Correct. And skilled hackers do this, why should we assume they do it for fun rather than for profit? I mean, isn't the logical inference to draw that people that are in rooms overseas doing all this are actually doing it to make a buck? Your Honor, I think they typically have, there are some, in a small percentage of cases, people do it for bragging rights. People do it in order to get access to the dark web. It could be the 15-year-old in my basement. She should. Well, she's 16 now and she's pretty smart. It could be her. Right. It could be. Probably not. It's probably a bunch of, you know, people in a room somewhere overseas doing it for money, right? More likely than not. But the money is not always going to be achieved by identity theft. So hackers have other motivations. They take the information for money. And you're saying the money is not always achieved by identity theft because if they sell it, the persons they sell it to may not necessarily go after these specific employees? Is that what you're saying? That's one reason. But also they don't always sell the data. The data isn't always, in the word that law enforcement use, they can't always monetize it. There are many, many breaches that never result in identity theft. How do we know whether this data theft was monetized? How do we find that out? Well, we have a sense that it was not because no one's come forward in three years to say that their personal information fell into the hands of criminal abuse. So if five years from now we learn that it was monetized and they sue, you're not going to bring a statute of limitations bar at that time? All things being equal, it would be inconsistent for me to stand here and say there's no standing today and say that that doesn't give rise to a cause of action. I don't know. I get the sense that I'd be sitting in this chair five years from now and we'd be looking at a statute of limitations bar and your argument, at least the argument I'd make if I were in your shoes, is they knew about it. They learned about this five years ago. And we have all kinds of cases where if people don't act when they learn about the misfeasance, then that's when the clock starts running. And that's when the harm occurs. And that's when the harm occurs, right? Should we be concerned about that? I mean, there does appear to be a real whipsaw possibility here. I think, Your Honor, I think the concern is this. If you rush to the courthouse and start a class action in a data privacy matter where there's no actual harm, then you're putting a matter in the head there. What if it's not a class action? One person. I mean, why should this being a class action matter? Does it matter? Only because those cases tend to get filed quicker than the individual case. And then they are resolved by judgment or settlement, sometimes quickly. And if the real harm isn't going to occur for five years, then the members of the class who didn't opt out are going to be bound by whatever settlement they got. When the posture of the case is one where there's been no actual harm, so any settlement or verdict isn't going to be commensurate with what might actually happen five years from now. But that claim will be foreclosed. Focus on Holt's case for a second. Forget about the other people. The district court was not impressed by the fact that Holt lost a security clearance, and then the district court said, well, that's kind of a walk-off fire. It's been a lot lately, actually. The district court said, well, he can't manufacture a standing by changing his job. But he didn't change his job voluntarily. He snatched the condition proceeding to his job away from him, his security clearance. Now, why isn't, at least as far as Holt is concerned, why isn't a very, very clear standing demonstrated? And I'm going to sound like I'm not answering the question, but I am. That's a very nice way to preface a response to just that answer. It is. The analysis is if there's injury in fact, then anything that happens as a result of that data breach, I go out and change and close my bank accounts. I buy my own identity theft protection, is a compensable item of damage. But first you have to have injury in fact. I lost my security clearance. Why isn't that injury in fact? Because there is, as of right now, no injury resulting from the data breach. That's why he lost his security clearance. If he had decided to go take some steps because he had a fear of future identity theft, it would not be compensable now. That's what the case is saying. So it's the actions of his employer. The problem here is that this is not like Crapper where they went around and they were concerned about a security issue and were not. He actually lost his security clearance. Why do you not concede that his situation is different? I don't concede his situation is different because he doesn't have a concrete harm. Hasn't he been harmed just because there was a breach? He lost his security clearance. And that's a total cause and effect. I mean, it's not just imminent. It happened. But he lost his security clearance because of a judgment that was made by his employer that he has his job and for his job he has to have, you know, dot the I's, cross the T's, being a secure person. Once there's a data breach, he's no longer qualified. Well, it was a temporary suspension. Okay. And that's in there. But even so. And those rules are his employer's rules. They may not be logically connected to the event. Notice his employer's rules. If they were his mother-in-law's rules, he wouldn't have lost his security clearance. He lost his security clearance because his employer said he had to have a security clearance to do his job. That's why he lost his job. And as a result of that, his commute was impacted. Isn't that a harm that under all the case law would be sufficient? I disagree, Your Honor. The threat of future, the fear of future identity theft. That's not what his problem is. That's what you're saying no one else has. But he has a very different situation, factually, does he not? But his situation is created by the fact that his employer took an unsupported decision. He has lost time and money. That's about as concrete as it gets, isn't it? And I guess you're saying, well, there's an intervening third party. Then would you make the same argument that if we learned that the people that gathered this data sold it to somebody else and that somebody else started charging funds on credit cards, your argument, I guess, would be, well, that's not real harm because there was an independent third party that decided to bring up some charges on the credit card. Is that your argument? No, Your Honor. In fact, the case is that. . . That's an independent criminal actor. And here the employer who took this action against Holt is not even an independent criminal actor. This is just a business that's making a business decision. So you're saying. . . Your argument is all about causation. It's not about whether harm has been suffered. Isn't that correct? In the first instance, there is no claim that can be brought against pay time without injury in fact. The injury, the harm, would be if there's misuse of the data or misuse is imminent. You're talking about an event that occurs. . . How can you limit that? Again, you're talking about causation. What I'm saying is that there must, before you can get to a measure of damages on causation, causation or a measure of damages, pay time must have, the plaintiffs must be able to show that pay time is responsible for harm, for a conflict of interest, which is actual or imminent. That goes to the merits of the case. That gets back to what I suggested. Maybe they have a weak claim because of the lack of privity and the employer's in the middle and maybe your client didn't even owe a duty. But that all goes to the merits of the case, not the standing, right? I agree that in his case, there's a 12B-6 and the summary judgment motion. They're not the issues we're here to talk about. But they have to demonstrate that the injury is, that this information has been misused. What we did, if we did anything wrong. . . They have to show that. That's your argument, and I understand that. But as to Holt, why do they have to show misuse of information to show a harm? Is it Holt or Wilkinson?  It is Wilkinson? Yes. He lost his job? Yeah. Because there is no injury unless pay time, pay time has not caused an injury unless that exploitation of their computer system resulted in misuse or misuse that is imminent with respect to Mr. Wilkinson. Who says that that's a limitation on what can be the universe of harm? I mean, again, I think you're talking about equalization. But it's really not, probably not relevant for the class purpose. But I think it's a distinct situation that might be showing harm, whereas I think your main point is the others have absolutely no impact on them at all, right? They have no impact. They have the things that we usually hear in these cases. I took time to change my bank account. I took time to buy new checks. But in the absence of misuse or imminent misuse, those are voluntary measures. And what I'm suggesting is. . . But you're saying Riley is controlling. What the employer did was a voluntary measure. You would say Riley is controlling. Riley is controlling. But is there a tension between Riley and Horizon, then? And do we need to take a new bank review to try to harmonize the tension? I'm familiar with the concurrence. And the concurrence, I could see that it could be argued that there is a tension there. But if every data breach results in the type of invasion of privacy to confer standing, then everyone who ever got a notice letter can bring their case to this courthouse and every courthouse. Including federal judges. Yes. But the fact that the universe of plaintiffs may be very, very large doesn't go to whether or not. . . And I think that's what the mutual court got focused on. It starts off by saying there are two kinds of companies, some that have been hacked and those that don't really have been hacked. But I'm not sure that goes to help at all in terms of the standing analysis. That just goes to show maybe the universe of plaintiffs is very, very large. And there may be a fact of concern that that end realization, that end reality, that maybe should factor in when you're trying to factor in reasonable damages, goes to the analysis of whether or not there's been an imminent harm. What if the universe is that large? The argument that's being made that there's imminent harm is an assumption that if my data is, or your data is exposed, that sooner or later it's going to be used. And that is not true. It's simply not true. I think it's a little more than that. I'm not sure. . . You used the phrase data exposed. Well, I think you want to know what kind of exposure. If it's a joke, that's one thing. If it's a friendly attack testing your perimeter, that's another thing. If it's people in the business of gathering this stuff and selling it, that's a very different thing, isn't it? It is a different thing, Your Honor. But people who gather it and sell it don't always, or with the intention of selling it, aren't always able to sell it. They cannot always monetize it. They don't get it as a gift to somebody who exploits it. It never gets used. And we don't find that out without discovery, right? I mean . . . There are a great many cases in which standing is found because the plaintiffs came forward after there was attempted fraud or actual fraud. In those cases, you don't need discovery. There's been actual fraud or attempted fraud, and that's pled in the complaint. That's not pled in this complaint. What's pled in this complaint, in the proposed amended complaint in paragraph 49, is an assumption that it's folly to assume that information that's stolen won't be used. In the statistics that they've used, three out of four people whose information has been stolen will not be victims. So it's not folly to assume that. We're focused on that in terms of this definition of imminent. And all you think of is if I know my car has a 25% chance of brake failure, I'm not getting in their car. So why isn't that sufficient in terms of demonstrating an imminent injury? There's a 25% chance that someone is going to have their data solved. A plane crash is a more dramatic example. And there's a 25% chance the plane I'm getting into may crash. Sure as hell, I'm taking the train. I'm not taking the train. Even though it's California, I'm not getting in that plane. We're always more . . . I mean, there's always more cautious with human life, and the cases that talk about standing in human life. But the real analogy would be there are four cars, and only one of them has bad brakes, and you must get to the hospital. You're going to take a chance to be . . . A Uber. I wouldn't hit Uber. You could all Uber at this point. But you can see that's a pretty realistic area. But statistics . . . Can I just return for a moment to . . . I didn't completely answer Judge Harden's question about Spokio and the tension before I sit down. Spokio and Horizon don't speak to Clapper or standing based on imminent or the need for certainly impending harm. And that's because they ultimately, the majority opinion in Horizon and Spokio, their focus is whether or not the breach of a statute can supply the actual injury. And if you conclude that the statute . . . I'm wondering, thinking that you're absolutely right. It's very clear to me, and I can give you a specific language of opinion, where Spokio is not only about statutory standing. The court went beyond that, and I tried to be clear in that earlier. I thought it was a good language. Congress's rule in identifying and elevating harms does not mean that a plaintiff automatically satisfies immediate effect whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right. Article III standing requires a concrete injury even in the context of a statutory violation. And for that reason, the court goes on. That's on 136 Supreme Court 1549. So the statutory violation is certainly helpful, but it doesn't end the inquiry that we have to get into here, and that is whether or not the harm that's been alleged is sufficiently imminent, i.e., concrete, or maybe imminent and concrete. The statutory violation has to be concrete. It has to be concrete qualitatively and temporally. And that . . . But temporally, that's the imminence. Correct. Qualitatively, we've established that an intangible injury can satisfy that aspect of standing. That's correct. And I don't think if you get to that point where the violation of the statute involved is sufficiently and is qualitatively satisfying the concrete element, imminence isn't going to be an issue because once you determine . . . Say that again. You have the harm. Say that again. In the statute, if you conclude that the violation of statute is of the type that is . . . If the harm that is suffered is . . . And then finish that sentence that we just left to say. If the harm that is suffered is the violation of the statute plus . . . You're going to put statute on it. . . . plus traditional notions of concreteness, then you have an actual injury involved. Okay, that's not what I was going to say. I thought you were going to argue that if we conclude that the harm that was suffered was sufficiently concrete, then that gives you imminence. I thought that's where you were going. That's why I said take statute out of what you're saying and rephrase your argument. And perhaps Your Honor's formulation is superior to mine, but my way of thinking about it was if the violation of the statute gives you imminence, it gives you actuality at that point. If anything gives you imminence, forget the statute being violated, if the fact of . . . if the act which inflicts the purported harm is imminent, that gives you the standing. The issue is whether or not we have sufficient imminence and whether or not Riley precludes that and the extent to which Horizon cuts you away and how Spokiel falls into it. It seems to me how Spokiel has gotten substantially more difficult to just say that the mere fact of data being stolen, if the intent is malicious and it's pledged to be malicious, that that means that you've got a Riley situation and there's no imminence. So we didn't even discuss concrete in Riley. Well, going back to whether this hack was malicious, that is not known. It's an assumption. Then you're in trouble. There are other reasons. We don't need discovery to find that out. That wasn't a question. The plaintiffs would not need discovery if there had been actual malicious use of the information, which from what we can see there has not been. In addition, there's this assumption that the point of the hack, to get the financial information, is always to engage in identity theft, and that's not true either. Hacks have for their purpose commercial espionage. They have as their purpose extortion. And in those cases, the information is taken, it's not misused. It's acted upon. It's acted upon, but the party that the hacker is focused on to do harm to is someone more in the position of pay time or whoever had the data that was removed who owned the computer system, and the extortion goes to them. So not every theft of personal information will resolve the identity theft. If they alleged in their complaint that the data was stolen and that pay time was the victim of a ransomware attack, then that would belie any harm, any injury in fact, to the employees, right? Because the rational inference, probably the only rational inference in a ransomware attack, is that the bad actors got the data to get money from pay time, and, you know, people in the business of ransomware give the files back because if they didn't give the files back, they wouldn't get the ransom. But that's not what we have here. We don't have anything like that. We don't know what we have here. The scope is what's planned in the complaint. What we do know, right, I mean, I think it's fair to say we don't know generally what we have here, but we know a few things. And what we do know, according to pay time itself, is that bad actors gathered private information of the putative class members, correct? We know from the allegations in the complaint that they, just based on that. Forget the complaint for a minute. What did pay time itself say? I thought what I said was unobjectual, but correct me if I'm wrong. We know from pay time that bad actors gathered personal information of putative class members. Is that incorrect? That is not what pay time has said, Your Honor. All right. Then how is that wrong? What did pay time say? Pay time has said that skilled hackers from foreign IP addresses accessed personal information. And in letters that went to individuals informed them that may mean that their information was accessed. All right. So you're taking issue with my word gathered, I guess. Because you're saying they accessed it, but because they accessed it doesn't mean that they gathered it. That's correct. Well, it's pled that they stole. Right. It is. And it's pled that they stole it. Okay. And then we have to accept that as true. Yes. How do we not have to accept that as true? I think you do have to accept that as true. We do. Sure. It's frustrating for defendants in data privacy cases to know that the insertion of a five-letter word, for which there may be no support, will change the course of the litigation. But it has to be accepted here. I see your hesitation on that. I appreciate your candor, but it seems to belie what's really going on here, which is this isn't a case about who's right or who's wrong. It's about procedure and where we are in the civil process. And you obviously think it's malarkey that this stuff was stolen based on the way you responded. But we all, and maybe, you know, if we all made a value judgment, maybe the three of us would think it's malarkey. But yet we have to accept the conceit, according to you, it's a conceit, that it's not malarkey. It's absolutely factually accurate that this information was stolen. Your Honor, and I don't mean to suggest anything about what actually happened here, but I agree that it's pled is stolen and that's the four corners of the complaint. And what Riley says is that it's not simply whether they read it, copied it, which is what they would do to steal it. They have to understand it. Let's forget Riley. Let's talk about Clapper. Okay. Does Clapper help you or hurt you? I believe Clapper helps us.  Because Clapper says, again, that you need an imminent risk of harm. And that if the standing analysis requires an attenuated set of decision points and the intervention of actors who are not before the court, then you do not have a certainly impending injury. How much time transpired between the statute being passed and the complaint being filed in Clapper? Your Honor, I'm sorry, I don't know the answer to this. Almost no time. It was filed immediately. And was Clapper Rule 56 or Rule 12 case? I believe it's a Rule 12 case. Did they have discovery in Clapper? I don't believe so, Your Honor. I don't know whether or not they were the subject of anything. That was probably as speculative as you could possibly get. It's the data event letter, I'm assuming, I just want to be sure. The thing that is called the data event letter in the appendix, I'm assuming that is the letter that Paytime sent out to employees. Is that right? It's either the one that's to employees or to the employers, because first Paytime informed its clients and employers. Because there it said that the breach was orchestrated by skilled foreigners who intended and ultimately did steal the PFI, personal finance information, with intent to sell the information on the black market. And that's in Paytime's own letter. It said page, where is that? They didn't page that. Page the appendix. Page 13 of the appendix. I don't know. You're saying the argument, and we've gone way over it. Mr. Lynch reserves some time for rebuttals. Why don't we hear from Mr. Lynch? And before we forget, we want letters from both counsel regarding the allegations and regarding invasion of privacy of ARM as informing the standing analysis. Right. From Mr. O'Toole and Ms. McCarran. So Judge Harper, Clapper was, in fact, a summary judgment case, and the complaint was filed immediately upon the passage of the statute. But you did not ask for discovery here, did you? We didn't ask for discovery because we still had the complaints allegations under Rule 12B1. It was a facial challenge. And do you concede that if we were to vacate the decision of the district court, that there's a chance that during discovery it would be learned that the data breach was effectuated by people who either had no malicious intent or, despite malicious intent, are unable to act on it, and therefore it might be determined at a later date that you have no injury, in fact? I don't think that's very likely, given the fact that... I didn't ask you if it was likely. I'm asking if it's possible. I suppose that's possible. It's an inverted analysis of standing, though, for me to hypothesize about something... Can you put the microphone up for a little bit? Yeah. The forensic investigation that was conducted, you can tell by the way they're paraphrasing it, as best they can to minimize the effect of their public announcement, suggests to me, based on my experience in other data breach cases, that they already know it was nefarious. They already know that somebody took it and is using it. They're just soft-selling it in their announcement. It's kind of hard to go there when, you know, you're telling us that they're already using it, but none of your clients have made you aware of any serious adverse impacts they've suffered during the last several months? We have five or six clients, Your Honor. This is not a credit card data breach. It's the opposite of that. In a credit card data breach, they have to use the cards immediately. They have, like, a shelf life very quickly because they reissue them. This is different. They have people's Social Security numbers. They have this forever. They tend to sit on that data, and they use it down the road. This is much worse in terms of the data itself. So why not sue later? Why not sue, you know, when they... There is certainly cause to believe that people will gather data and then sit on it and use it at a quieter time, but why not sue, you know, 10 years from now when that actually happens? Because we don't have any discovery. There's no indication that that in total is being sat on forever, and we have statutes of limitations issues, and we have just the liveness of the case. You want to keep information current when you're conducting discovery about a breach. So for all those reasons and the fact that we have, under a simple plausibility standard, have alleged facts that give us standing based upon Clapper's analysis of imminent risk. But if you win here, and you have standing, and you're put to your proof, and there's actually no showing of any harm, you've blown it in terms of later on when it's used. It's going to be, they'll say, well, wait a minute. You took the position that it was actionable early on, and you couldn't prove damages. You're foreclosed. You already had that case heard. So give me that burden, Your Honor, and I'll run with it. Clapper is a summary judgment decision. Give me the discovery. I can sustain summary judgment by showing an imminent risk at that point. I don't have to show the actual harm, even in summary judgment, but I will have evidence after having conducted discovery. There are not going to be damages right now. Damage would be the imminent risk, which I can establish. Well, guess what a jury's going to say. What are we going to give you? It's been three years. There's nothing there. Everyone in the class is going to get $100 or $500 to change all their credit card numbers. And then later, when somebody steals a million from their bank account, you're res judicata, and you don't get it. So the problem with this type of data is that it does have a long, long shelf life because it involves Social Security numbers and dates of birth. It's not like a credit card case where it expires quickly. So that, in fact, is a bit of a problem. So you should hope you lose now. No, because you never can win later on. Why? Because the statute of limitations is going to expire. No, no. If we say the harm hasn't occurred, then it's done. There's no accrual of the cause of action, and the harm occurs later. When it happens, you're better off. We're in a strange position of being able to protect you by ruling against you. Somehow that doesn't give me any comfort. Maybe it gives your clients comfort, though. I don't think it should. I think you have to wrestle with Judge Rendell's point because this is a serious consideration. If you tie the class up in a bow and everybody gets $500 to change things around and you get your fee, and five or ten years from now, really awful things happen to your clients, they may be out of court. The best you can do is take steps now to get them adequate compensation. Let me ask this. If the remedy, if you get past this hurdle, and it turns out the remedy is protracted credit monitoring, how long, and I don't know, and this is how much it costs to do credit monitoring for these employees, how long would you suggest the damages should require the credit monitoring to apply? So that would come down the road as we get closer to a trial. That's why I asked this. Lifetime credit monitoring. Pardon me? Lifetime credit monitoring. That's the only way you can get around a situation like this. Sometimes you can compromise. But what if the credit monitoring fails? There's no assurance that it's necessarily going to succeed. It's the best you can do. That's what makes these damages significant. Just very quickly, plaintiff Wilkinson, Joint Appendix, page 92, that's his allegation. It was a government contractor that he worked for. He had no import in it. It was not self-inflicted harm, as the panel pointed out to my opposing counsel. That's different than running out and taking prophylactic measures to buy data protection. Has he sued individually? He has not. He's suing with us. He's an individual plaintiff in this case. He's in the storm case as one of the plaintiffs in the complaint. So he's suing individually in this case. He alone establishes enough damages to reverse this. On his own. But he's the only one that would have to to establish standing for the rest. Well, but he has a different situation. Yeah. So that for sure is there. Riley is not relevant once again because of the differences of the plausible allegations in this complaint versus what occurred in Riley. When do we want the letter from counsel? For 10 days. Do you want the appellee to respond at the same time? We don't need simultaneous letters. Okay. Okay, thank you. Thank you.